No. 71–519. SPENCER ET AL. *v.* KUGLER, ATTORNEY GENERAL OF NEW JERSEY, ET AL.

MR. JUSTICE DOUGLAS, dissenting.

The black students in this case want nothing more than to receive the same quality of education from our public schools as is enjoyed by the whites. To deny them that equality is to sanction the dispensation of public benefits according to the invidious classification of race.

Appellants sought to convene a three-judge District Court in order to challenge the constitutionality of New Jersey's statutory scheme establishing the boundaries of school districts. They argue that by establishing school district lines to coincide with the boundaries of the State's political subdivisions, cf. N. J. Rev. Stat. § 18A:8–1, the State imposed upon the public schools patterns of racial imbalance in violation of the Civil Rights Act of 1871, Rev. Stat. § 1979, 42 U. S. C. § 1983. It is said in reply that New Jersey prescribes school district boundaries only in conformity with municipal boundaries. There is, however, a showing that at times a black has to walk further to his school than the white school in his neighborhood. The remedy is redistricting. We have sponsored that process to protect the right to vote. *Reynolds* v. *Sims,* 377 U. S. 533. The right to education in the environment of a multi-racial community seems equally fundamental.

The result, according to appellants, is an inferior education for students of minority races—something this Court has long condemned. *McLaurin* v. *Oklahoma State Regents,* 339 U. S. 637; *Sweatt* v. *Painter,* 339 U. S. 629; *Sipuel* v. *Board of Regents,* 332 U. S. 631; *Missouri ex rel. Gaines* v. *Canada,* 305 U. S. 337. See also *Plessy* v. *Ferguson,* 163 U. S. 537; *Yick Wo* v. *Hopkins,* 118 U. S. 356. Appellants sought either a redistricting or an appropriate racial balance in the public schools so that educational opportunity would not be determined by race, cf. *Gomperts* v. *Chase, post,* p. 1237, or compensatory educational programs to correct the inferior schooling given minority students. The District Court in that case had rejected this approach, however, and dismissed the complaint, finding refuge in *de facto* segregation. 329 F. Supp. 1192.

If any form of state-imposed segregation is proved, then the racially homogeneous residential neighborhoods

and the consequent racial imbalance in schools would seem to be the result of state action.* " 'It is a question of the power of the State as a whole,' " Mr. Justice Brandeis

---

*In this case the white exodus to the suburbs and the resultant surrender of the inner city to the blacks is evident. "In 1910, 73 per cent of the Negro population of the United States were rural; in 1960, 73 per cent were urban." K. Taeuber & A. Taeuber, Negroes in Cities 1 (1965). That shift in residential patterns has been both encouraged and facilitated by federal, state, and local actions. In a recent statement to the Senate Subcommittee on Education, the United States Commission on Civil Rights· indicated how pervasive this governmental influence is:

"Even in those instances where school segregation is a result of housing patterns with no apparent complicity of school officials, government at all levels—local, State, or Federal—invariably is heavily implicated. Historically, racial zoning ordinances imposed by local law were a formidable factor in creating and maintaining racially exclusive neighborhoods. Although such ordinances were held unconstitutional as early as 1917, some communities continued to enforce them, even as late as the 1950s.

"Judicial enforcement by State courts of racially restrictive covenants has been another important factor. Although these covenants were private agreements to exclude members of designated minority groups, the fact that they were enforceable by the courts gave them maximum effectiveness. Not until 1948 was the judicial enforcement of such covenants held unconstitutional, and not until 1953 was their enforcement by way of money damages held unlawful. Racially restrictive covenants no longer are judicially enforceable, but they still appear in deeds and the residential patterns they helped to create still persist.

"Various exercises of local governmental authority, such as decisions on building permits, the location of sewer and water facilities, building inspection standards, zoning and land use requirements, and the power of eminent domain have been used to exclude minority group members from designated neighborhoods and even from entire communities.

"The Federal Government, principally through its public housing and FHA mortgage insurance programs, has been all too often a willing partner in the creation and perpetuation of racially segregated neighborhoods, even to the point of insisting upon them. Until the

said. "[T]he powers of the several state officials must be treated as if merged in a single officer." *Iowa-Des Moines Bank* v. *Bennett,* 284 U. S. 239, 244–245 (1931). The Constitution condemns "discrimination, whether accomplished ingeniously or ingenuously," *Smith* v. *Texas,* 311 U. S. 128, 132 (1940), and where there has been any such discrimination our "objective [is] . . . to eliminate from the public schools *all vestiges* of state-imposed segregation." *Swann* v. *Board of Education,* 402 U. S. 1, 15 (1971) (emphasis added).

There is, moreover, an ancient American doctrine that as, if, and when public facilities are separate for the races

---

late 1940s, for example, FHA insisted on racially restrictive covenants to insure against integrated housing developments. Until 1962 when the Executive Order on Equal Opportunity in Housing was issued, the agency continued willingly to do business with discriminatory builders and developers. The Public Housing Administration permitted its funds to be used for the creation and perpetuation of segregated housing projects well after the courts had made it clear that such practices were in violation of the Constitution. Other Federal programs, such as the highway and urban renewal programs, which involve massive displacement and relocation, also have had the effect of intensifying residential segregation.

"The point we are making is that the current situation we face, in which most minority group children attend school in isolation from children of the majority group, is *not* accidental or purely *de facto*. In many cases, it has resulted in whole or in substantial part from an accumulation of governmental actions. Thus the categorical distinction between *de jure* and *de facto* segregation is not as clear-cut as it would appear. Upon closer examination, there is probably little legal substance to the concept of *de facto* school segregation. Further, in the Commission's view, the Government has a moral as well as legal responsibility to undo the segregation it has helped to create and maintain. There is no statute of limitations by which government in its many forms can be exonerated from its past misdeeds or relieved of its current obligations." Hearings before the Subcommittee on Education of the Senate Committee on Labor and Public Welfare, 91st Cong., 2d Sess., 352–354 (1970).

they must be equal. *Plessy* v. *Ferguson, supra,* held that a State could maintain separate facilities for different races providing the facilities were equal. We have long since repudiated the notion that a State may maintain racially distinct facilities for the races, because classifications based upon race are invidious and thus violative of the Fourteenth Amendment. But there can be *de facto* segregation without the State's being implicated in the creation of the dual system and it is in such situations that *Plessy*'s mandate that separate facilities be equal has continuing force. Our conclusion in *Brown* v. *Board of Education,* 347 U. S. 483, 495, that "[s]eparate educational facilities are inherently unequal," has been convincingly borne out by scholarly studies. *E. g.,* J. Coleman, Equality of Educational Opportunity (1966); Harvard Educational Review, Equal Educational Opportunity (1969); Alexander & Campbell, Peer Influences on Adolescent Educational Aspirations and Attainments, 29 Am. Socio. Rev. 568 (1964). This inequality led Senator Mondale to conclude:

> "In 1968, there were more than 43 million children in our public elementary and secondary schools. 9 million were from minority groups: 6.3 million were black; 2 million were of Spanish origin; 194,000 were from Oriental backgrounds; 178,000 were American Indian.
>
> "Most of these children are from families living in poverty. The vast majority are deprived of a decent education throughout their lives. They go to schools which are inferior—educationally, financially, and physically. They are years behind in achievement. Few go on to higher education." 117 Cong. Rec. 10750.

Senator Javits recently summarized the problem: "Whatever you call it, 'de facto segregation,' 'racial un-

balance,' or 'the absence of intergroup activity,' it is a serious block to effective education for children of minority groups anywhere in the country, especially in the north and central part of the country where you don't have the established social order of segregation." Hearings on Emergency School Aid Act of 1970 before the Subcommittee on Education of the Senate Committee on Labor and Public Welfare, 91st Cong., 2d Sess., 21 (1970).

I would note probable jurisdiction and set the case for oral argument.