David **ALVARADO and Dolores Alvarado et al., Plaintiffs-Appellants, Cross-Appellees,**

v.

**EL PASO INDEPENDENT SCHOOL DISTRICT et al., Defendants-Appellees, Cross-Appellants.**

Nos. 77–1288, 77–3301.

United States Court of Appeals, Fifth Circuit.

April 5, 1979.

Vilma S. Martinez, Peter D. Roos, Mex. American Legal Defense & Educ. Fund, San Francisco, Cal., Albert Armendariz, Sr., El Paso, Tex., for plaintiffs-appellants, cross-appellees.

Sam Sparks, Harold L. Sims, Morris A. Galatzan, S. Anthony Safi, El Paso, Tex., Joaquin Avila, Joel G. Contreras, Linda Hanten, Mex. Amer. Legal Defense & Educ. Fund, San Francisco, Cal., for defendants-appellees, cross-appellants.

Ronald R. Calhoun, El Paso, Tex., for Sidney Brooks, et al.

Jack Ratliff, El Paso, Tex., for Lincoln School PTA.

Before AINSWORTH, GODBOLD and HILL, Circuit Judges.

AINSWORTH, Circuit Judge:

This class action was brought by Mexican-American parents on behalf of themselves and children, and other parents and children, against the El Paso (Texas) Independent School District alleging racial and ethnic discrimination by the defendant School District in operating a dual segregated school system with regard to children of Mexican descent and other minorities. Jurisdiction is asserted under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §§ 1981, 1983 and 1988.

The complaint was originally filed in December 1970, and dismissed on the pleadings by the district court (Judge Guinn, now deceased). In June 1971 we reversed the district court's dismissal of the suit and remanded the case for a full trial on the merits to determine whether desegregation policies of the School District comply with existing principles of law enunciated by the Supreme Court and this court. *See* 445 F.2d 1011.

Thereafter a lengthy trial on the merits of plaintiffs' allegations was held by the district court (Judge Sessions) in December 1975. Additional information was obtained by the court in a post-trial inquiry. The court rendered its decision with detailed findings of fact and conclusions of law and memorandum opinion on December 23, 1976. Both plaintiffs and defendants appealed from the district court's order.

Subsequently, on March 28, 1977, the School District presented a plan for implementation of the district court's order. There followed a hearing, further orders, petitions for reconsideration, resulting in a final order of the district court dated September 29, 1977 in which the court refused to exempt first and second grade students from the mandatory transfer provisions of the plan and declined to withdraw its order relative to equalization of air conditioning of predominantly Mexican-American schools. The School District also appealed from this order. We denied motions of defendant to stay the district court's orders pending appeal.

Accordingly, this court has before it two orders of the district court pertaining to the

School District, the first and principal order being that of December 23, 1976 and the second being that of September 29, 1977, the appeals being consolidated here for consideration.

We first review the correctness of the district court decision and order of December 23, 1976 which is reported at 426 F.Supp. 575–616, and contains 108 separate findings of fact and 12 conclusions of law. The court's decision traced the history of education in El Paso as it related to Mexican-Americans. In its findings and opinion the district court considered all phases of public education in the El Paso Independent School District, including student assignment and transfer, faculty and personnel, curricula, transportation, school construction and site selection, air conditioning of school buildings, athletic programs, special education, etc. In its memorandum opinion the court pointed out that in El Paso "no statutory dual school system has ever existed as to Plaintiffs' ethnic group." *Id.* at 595.

Pertinent to the foregoing, the district court in its Finding No. 31 stated:

Prior to June 1955, the El Paso Independent School District, as mandated by State law, maintained and operated a segregated school for Negro children only. In June of 1955 the El Paso Independent School District desegregated promptly following the Supreme Court decision in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 and with regard to Negroes the School District remains and is a desegregated, unitary school system.

It is clear from the outset of our discussion of this case that there has been no mandatory segregation by Texas state law of Mexican-Americans in the El Paso Public School System. After consideration of all the evidence the district court concluded (*Id.* at 610) that "[p]laintiffs have successfully demonstrated that the Defendant School District has effectuated intentionally segregative policies in a meaningful portion of the El Paso School System." The court also said, "Plaintiffs have further proved a

very limited present and continuing duality in the areas of school siting and construction, transportation and assignment of students, and personnel."

The court also stated:

Plaintiffs' *prima facie* showing of intentionally segregative actions in a meaningful portion of the El Paso School System thrusts upon the Defendant the burden of demonstrating that the extant level of systemwide segregation is not the result of purposefully discriminatory action on the part of the Defendant School District. It is the Court's belief that several important factors justify the conclusion that Defendants have successfully shouldered their burden.

*Id.* at 610. The court further said that "within the past fifteen years the Defendant School District has undertaken the implementation of significant programs intended to equalize educational opportunities for all students within the Defendant School District." *Id.* at 610–11.

The court then concluded:

As applied to the Plaintiffs' allegations and proof of past segregative actions on the part of the Defendant School District, the Court is convinced that, with the exception of the limited areas of present segregation which constitute Plaintiffs' *prima facie* case, the extant level of segregation within the El Paso Independent School District may not be attributed to past segregative design on the part of school authorities. Rather, and as established in the Findings of Fact, the existing level of segregation within the El Paso Independent School District is the result of geographic and demographic factors unique to the El Paso area.

*Id.* at 611. Relying on the Supreme Court's admonition in *Milliken v. Bradley,* 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974), quoting from *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554, that a federal remedial power may be exercised only on the basis of a constitutional violation and that "the nature of the violation determines the scope of the reme-

dy," the district court ordered that a number of the schools have their attendance zones redrawn, mandatory transportation be provided, optional majority to minority transfer be established, certain bus routes be changed, the number of completely air-conditioned schools of predominantly Anglo-American and predominantly Mexican-American be equalized, and the goal of racial balance of school teachers and personnel be further pursued. Thus in rendering its order the district court said that it "must sculpt a remedy which conforms to the level of identifiable violations of constitutional rights found herein." *Id.* at 611.

Both plaintiffs and defendants disagreed with the district court's decision. On appeal, plaintiffs contend that the court should have ordered "all out" systemwide desegregation of the entire El Paso School System. On the other hand, defendants contend that no relief is appropriate since there was no proof by plaintiffs of intentional segregative action on the part of the School District as to the Mexican-American ethnic group.

The physical setting of the case is described in the district court's opinion as follows:

As of the 1973–1974 school year, the El Paso Independent School District consisted of 35 elementary schools, 12 elementary-intermediate schools, 3 intermediate schools, 1 junior high school and 8 high schools, serving approximately 62,000 students. The School District is split by a mountain into a "U" shape and is bordered by the Ysleta Independent School District to the southeast, the Canutillo Independent School District to the northwest, the State of New Mexico to the west, the Rio Grande River and the Republic of Mexico to the south, and Fort Bliss, a large military reservation, to the north and east. Mt. Franklin rises to an elevation of over 7,000 feet above sea level, while downtown El Paso is less than 4,000 feet above sea level. The useable area between the southern foothills of Mt. Franklin and the Rio Grande affords a space 1.6 miles wide through the pass in the mountain range, east and west. The Franklin Canal, the Chamizal Highway, Interstate Highway 10, Paisano Drive, and other arterial streets and highways are all located within this narrow neck between the mountain and the International Boundary with Mexico. Also located in this pass are the railroad tracks and yards of the Southern Pacific Railway, Santa Fe Railway, Texas & Pacific Railway, and two Mexican railways which approach El Paso from the south.

Ciudad Juarez, a major metropolitan area with an estimated population of 498,058 in 1976, is located directly across the Rio Grande from El Paso. The District of Juarez, in the northwest part of the State of Chihuahua, contained 1.7 million people as of 1970 in a 94,831 square mile area encompassing the cities of Chihuahua, Felicias, Hidalgo de Parral and Juarez. El Paso's proximity to Ciudad Juarez and the constant flow of Mexican people from that city into El Paso have contributed to the unique problems faced by the Defendant School District.

*Id.* at 594 (footnote omitted).

The court said in its findings (Finding No. 18) (*Id.* at 580):

Mexican-American citizens and immigrants traditionally settled in south and southeast El Paso, primarily because of these areas' cultural attachment to Ciudad Juarez, Mexico, and the availability of low cost housing there. However, in recent years there has been a gradual dispersal of the Mexican-American population from the areas of El Paso contiguous to the international border to all geographical areas of the city. The north and northeast sections of the city have felt the impact of this population shift, though they remain predominantly Anglo-American in ethnic composition.

In the court's additional findings (Finding No. 20) (*Id.* at 580) we find the following:

Historically and currently, the influx of Mexican immigrants to south and southeast El Paso is a unique phenomenon which has required the Defendant School

District to accommodate a disproportionate number of minority students compacted into a relatively small geographic area.

It appears that there was an influx of Mexican Nationals at the time of the Mexican Revolution in 1910, the population of El Paso at that time being 40,000, increasing to 78,000 in 1920. Thereafter the city grew from 130,000 in 1950 to 276,000 in 1960 and 322,261 in 1970. In 1970, the Mexican-American population of El Paso was 187,-296, or 56.5% of the total. *Id.* at 579–80. The present School District was created on February 12, 1962 as the successor to the Independent School District of the City of El Paso which was created on November 14, 1882. *Id.* at 578.

In the 1974–75 school year there were 63,332 students in the entire school system. Of these, 59% were Mexican-American; only 3.22% were Negro.

The district judge in his memorandum opinion relied on the principles of the Supreme Court's decision in *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). The district court stated that since no statutory dual school system had ever existed as to the Mexican-American group in El Paso, plaintiffs had the burden of proving that a segregated school system exists, that it was brought about and maintained by intentional state action, that intent in this context must be equated with a racially discriminatory purpose, and that there must be a causal relationship between the acts complained of and any racial imbalance existing in the school system. Thus the court said that a finding of intentionally segregative school board actions in a meaningful portion of the school system established a prima facie case shifting the burden to the defendant School District to prove that other segregated schools within the school system were not also the result of intentionally segregative actions. *Id.* at 595, citing *Keyes, supra,* 413 U.S. at 207–09, 93 S.Ct. at 2696–98. On appeal the School District argues that supervening decisions of the Supreme Court have discredited the burden-shifting presumption in *Keyes.* The School District contends that in the more recent decision of *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), the Court held in a unanimous opinion that a federal court may not enter an order against the School District unless plaintiffs have proved by a preponderance of the evidence that any presently existing segregation or discrimination was caused by School Board actions intended to discriminate or to segregate. Defendant School District here also relied on the recent case of *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977), a zoning case, to the effect that a segregative or discriminatory effect resulting from Board action, standing by itself, will not justify a finding of the requisite intent unless the result is "a clear pattern, unexplainable on grounds other than race," *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 564.

Plaintiffs' position is phrased in its brief (pp. 4–5) as follows:

> Presently, and consistently during the last nine years, approximately one-half of the Mexican American students attend schools where greater than ninety (90) percent of the students were Mexican American. Three of every four Mexican American students attended predominantly Mexican American schools. Similarly, the District's Anglo students have been educated in a segregated setting with six of every seven such students in predominantly Anglo schools. (Tr. at 926)

However, as pointed out in *Dayton, supra,* 433 U.S. at 413, 97 S.Ct. at 2772, "[t]he finding that the pupil population in the various Dayton schools is not homogeneous, standing by itself, is not a violation of the Fourteenth Amendment in the absence of a showing that this condition resulted from intentionally segregative actions on the part of the Board. *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976)." In *Dayton* the Court concluded that "[i]t is clear from the find-

ings of the District Court that Dayton is a racially mixed community, and that many of its schools are either predominantly white or predominantly black. This fact without more, of course, does not offend the Constitution. *Spencer v. Kugler*, 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972); *Swann, supra*, 402 U.S., at 24, 91 S.Ct. at 1280." *Dayton, supra*, 433 U.S. at 417, 97 S.Ct. at 2774. Thus the School District argues from the above that as a result of the Supreme Court's decision in *Dayton*, plaintiffs have the burden of proving their case by a preponderance of the evidence and the burden of proof is not shifted by the mere establishment of a prima facie case of meaningful segregation in a portion of the school system. Resolution of this legal issue is not critical to our decision in this case since, as the defendant School District itself points out in its brief, the district court held that defendants have successfully shouldered their burden under the *Keyes* rationale, 426 F.Supp. at 610, as to the extant level of ethnic imbalance shown by plaintiffs to exist in the school system.

The district court's order required the School District to present a plan whereby, through the establishment of a suitable transportation system, any student at Bowie High School could voluntarily attend Andress, Burgess, Coronado or Irvin High Schools, and any student in any of the named high schools could voluntarily attend Bowie High. The court ordered the redrawing of attendance zones of Roberts Elementary School, Lincoln Elementary-Intermediate School, Carlos Rivera Elementary School, White Elementary-Intermediate School and Putnam Elementary School, with the mandatory transportation system in these schools to equalize the percentage of Mexican-American students. Attendance zones were ordered redrawn for Dowell Elementary School and Schuster Elementary School; also for Travis Elementary School and Bliss Elementary School to equalize the percentage of Mexican-American students.

The court ordered: redrawing of the attendance zone boundary between Austin High School and Burgess High School accompanied by redrawing of the attendance zones of Irvin High School and Jefferson High School and also Burgess High School; also redrawing of the attendance zones of Burgess High School to accommodate students presently attending Jefferson High School; rearrangement of bus routes for students of certain routes to Austin High School in lieu of Burgess High School, and Burnet Elementary School to be accompanied by redrawing of the boundaries of Logan Elementary School to accommodate students from Burnet Elementary School; the number of predominantly Mexican-American schools that are completely air conditioned to be increased to equal the number of predominantly Anglo-American schools completely air conditioned; the recruitment of sufficient qualified bilingual-bicultural teachers and administrative personnel to achieve the racial balance in the 1972 HEW agreement with special emphasis on the hiring of additional qualified Mexican-American high school teachers and other classroom teachers; the promotion of qualified minority personnel as officials, administrators and managers, assistant principals, consultants and supervisors, and other professional staff.

The School District seeks reversal of the order in these respects, claiming that the court's holding is clearly erroneous because plaintiffs failed to prove that any ethnic imbalance in any of the schools was caused by intentionally discriminatory action.

For example, as to the court's order relative to Bowie High School, a predominantly Mexican-American school, the School District points out that the new Bowie school, established in 1973 to serve the same neighborhoods as the old Bowie, was built on a 60.8-acre tract of land close to the old Bowie campus and deeded to the district by the Federal Government in exchange for the School District's land transferred to Mexico. This resulted from the settlement of the Chamizal border dispute between the United States and Mexico since it was necessary to transfer part of the old Bowie campus to Mexico and a new school campus had to be

secured. According to the School District, no one stated any disapproval of the new proposed location or construction of the school; that no other site for school purposes was available at any price within the attendance zone; further, it was supported by a petition of 9,211 signatures of ex-Bowie High School students and friends requesting the new school be built on the federal land and be named Bowie. No witness at the trial stated that there was a reasonably available alternative site for the construction of the new high school which would have resulted in significantly less ethnic imbalance.

The Board makes similar contentions concerning the court's order relative to Roberts Elementary School whose attendance zone was required to be redrawn in order to equalize the percentage of Mexican-American students. The School District showed that when Roberts opened in 1961 there was a Mexican-American student body of 65.83%; that later the Sandoval Federal Housing Project was built in 1973 immediately adjacent to the school, the project being populated mostly by Spanish-surnamed Americans and the enrollment since that time at Roberts has averaged 86.16% of Spanish surnamed. The District argues that the change in the ethnic enrollment at Roberts resulted from neighborhood changes over which the School District had absolutely no control, i. e., construction of the Sandoval Federal Housing Project. Similar contentions are made with reference to Dowell and Schuster Schools whose attendance boundaries were drawn long before the Eisenhower Federal Housing Project was built, which project caused Spanish-surname enrollment at Schuster to increase from 31% to 57%—a change in the character of the neighborhood not attributable to the School Board nor its attendance zone boundary. Thus the difference in ethnic composition of Dowell and Schuster was not caused by action of the School District.

It is unnecessary to repeat the Board's argument with reference to changing other school attendance districts such as Travis and Bliss Schools, Austin and Burgess High Schools, Logan and Burnet Schools since they are to the same effect.

The court's order as to personnel requires achievement of the racial balance set forth in the 1972 HEW agreement. Assignment of teachers as between Mexican-American and Anglo-Americans to meet certain tolerance standards is also required. It is pertinent to note, however, that the United States Commission on Civil Rights has determined that the School District is in compliance with Title VI of the Civil Rights Act and that HEW is apparently satisfied with the School District's performance under its 1972 agreement.

The court ordered that the District increase "the number of predominantly Mexican-American schools that are completely air conditioned to equal the number of predominantly Anglo-American schools that are completely air conditioned" based on its finding that there were more predominantly Anglo-American schools completely air conditioned. The Board points out, however, that four (not three) of the eleven air-conditioned schools are composed primarily of Mexican-American students, but argued that as to the 12,387 students in the air-conditioned schools, 6,156 of these were Spanish-surnamed students; therefore, that no discriminatory intent can properly be inferred. We will not disturb the district court's holding in this regard since we do not view it as clearly erroneous; however, insofar as the order operates prospectively, when the constitutional violation has been remedied by the School District, the order to equalize air-conditioned facilities should end. *See Pasadena City Bd. of Ed. v. Spangler,* 427 U.S. 424, 436, 96 S.Ct. 2697, 2705, 49 L.Ed.2d 599 (1976). The School District informs us that the voters of El Paso, pursuant to a 1970 petition to the School Board, rejected a bond issue of $21,000,000 to air condition all school buildings.

Plaintiffs contend that given the district court's ruling that they established a prima facie case of discrimination, supported by findings on named schools such as Bowie, Roberts, Dowell, Schuster, and others, a systemwide order should have been ren-

dered. They recount the history of Mexican schools in the late 19th century and early 20th century to show the ethnic isolation of Mexican-American students which prevailed from the outset of public education in El Paso.

On the other hand, the School District points to the early reluctance of Mexican-American parents to send their children to public schools. The parents were suspicious of public education and wanted their children to be taught in Spanish and to respect the traditions not only of the United States but also of Mexico. Thus the School District avows that there is "absolutely no evidence that children were ever placed in schools according to their ethnic background." To induce them to send their children to public schools, they were built close to the homes of Mexican-American families who had initially refused to send their children to public schools. The preference of Mexican-Americans to settle near the Mexican border has been described—the desire being to maintain "their close contacts with Mexico." South El Paso, directly across the Rio Grande River from Mexico, was the principal, virtually exclusive, place of habitation, which was predominantly Mexican-American even prior to establishment of the El Paso Public School System.

We are guided in our review of this case by what was said in *United States v. State of Florida*, 5 Cir., 1973, 482 F.2d 205, 207–08, as it pertains to the clearly erroneous rule:

> Rule 52(a) of the Federal Rules of Civil Procedure provides that the findings of fact by a district court in actions tried without a jury shall not be set aside unless "clearly erroneous". *United States v. United States Gypsum Company*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948), reh. den. 333 U.S. 869, 68 S.Ct.

788, 92 L.Ed. 1147 (1948). Under this rule the determination of the factual content of ambiguous testimony is for a trial court, and such determination can be set aside on review if "clearly erroneous". *Guzman v. Ruiz Pichirilo*, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962). The rule is also applicable insofar as the district court's conclusion is based on inference drawn from documents or undisputed facts. *United States v. Singer Manufacturing Company*, 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963).

> Furthermore, since the jurisdiction of this court is appellate, we have no right to re-try the issues of fact *de novo* or substitute our judgment with respect to such issues. *United States v. United States Gypsum Company, supra; Guzman v. Ruiz Pichirilo, supra; United States v. Singer Manufacturing Company, supra.* The function of this court is to determine whether, as a matter of law, the findings sustain the judgment. If, however, the findings of the district court are unsupported by substantial evidence, then the lower court's decision may be set aside.

(footnotes omitted) Quoted with approval in *George W. B. Bryson & Co., Ltd. v. Norton Lilly & Co., Inc.*, 5 Cir., 1974, 502 F.2d 1045, 1049.

Under the circumstances, the district court's findings in this case are best let alone since there is sufficient evidence to support them and the district judge has tailored a remedy commensurate to the specific violations found to exist. *See Dayton, supra*, 433 U.S. at 417, 97 S.Ct. at 2774.[1]

AFFIRMED.

---

1. Careful consideration has been given by us to the School District's appeal from the district court's order of September 29, 1977, and to the objection to including first and second grade students in the schools affected by the district court's remedial order. As plaintiffs point out in their brief, kindergarten students are excluded without dispute by the parties. They also show that the schools involved are contiguous, in close proximity to each other, and massive, long-distance busing has not been required. We will not disturb the court's second order for the same reasons which impel us to affirm the court's initial remedial order, that we find no abuse of discretion by the trial judge. *See Flax v. Potts*, 5 Cir., 1972, 464 F.2d 865, *cert. denied*, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972).