No. 78–671. DELAWARE STATE BOARD OF EDUCATION *v.* EVANS ET AL.; and

No. 78–672. ALEXIS I. DU PONT SCHOOL DISTRICT ET AL. *v.* EVANS ET AL. C. A. 3d Cir. Certiorari denied. THE CHIEF JUSTICE agrees these cases merit review here but only when a full Court is available to consider the important issues presented by the petitions for certiorari. MR. JUSTICE STEVENS took no part in the consideration or decision of these petitions. Reported below: 582 F. 2d 750.

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE STEWART and MR. JUSTICE POWELL join, dissenting.

In 1971, respondents in these cases instituted an action seeking the desegregation of the schools in the city of Wilmington, Del. The litigation has now culminated in a countywide remedy more Draconian than any ever approved by this Court. The order provides for the dissolution of the county's 11 independent school boards, most of which were locally elected. In their place, the District Court "created" a single countywide school system, to be run by court-appointed officials for five years. Within this judicial school district, which comprises in excess of 60% of all the public school students in the State of Delaware, every single student will be reassigned away from his or her local school for a period of no less than three years and for as long as nine years. The plan is designed to accomplish a racial balance in each and every school, in every grade, in all of the former 11 districts, mirroring the racial balance of the total area involved.

The three-judge District Court which initially found a desegregation remedy to be warranted, expressly found that 10 of the 11 county school districts had established fully unitary school systems after this Court's decision in *Brown* v. *Board of Education,* 347 U. S. 483 (1954). *Evans* v. *Buchanan,* 393 F. Supp. 428, 437, and n. 19 (Del.), summarily

aff'd, 423 U. S. 963 (1975). Only the school district in the city of Wilmington was found to have engaged in discriminatory conduct—conduct which the court did not find to be purposeful.* The court did find, however, that the acts of other governmental entities resulted in an interdistrict violation. I think this Court should grant certiorari to review the District Court's imposition of this remedy, even accepting as settled the finding that there was an interdistrict violation warranting an interdistrict remedy.

One principle that has been continually emphasized in the desegregation opinions of this Court is that the "scope of the remedy" formulated by a district court must be tailored to fit "the nature and extent of the constitutional violation." *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 16 (1971). In order to effectively fulfill this mandate, we have made clear that district courts *must* "determine how much incremental segregative effect [the constitutional] violations had on the racial distribution of the . . . school population as . . . compared to what it would have been in the absence of such constitutional violations." *Dayton Board of Education* v. *Brinkman,* 433 U. S. 406, 420 (1977). Without such a finding, it would not be possible for a judge to fulfill the equitable limitations commanded by *Swann.*

In this case, however, the courts have ignored *Swann* and

---

*The three-judge court identified the Wilmington school board's adoption of voluntary attendance zones, which "although possibly designed to minimize the flight of white families with school-aged-children" to the suburbs, as possibly having the opposite effect. 393 F. Supp., at 435. Thus the court specifically recognized that the policy in question may well not have been purposefully discriminatory, even though it may have had a discriminatory effect. Even the discriminatory effect, however, was only speculative since the District Court only found that "to some extent, . . . discriminatory school policies in Wilmington *may have affected* the relative racial balance. . . ." *Id.,* at 436 (emphasis added). I am prepared to assume, *arguendo,* that this Court's summary affirmance settles the question of an interdistrict violation, however, and would review only the imposition of the remedy.

*Dayton,* and held that as a matter of law, no such findings were required. The District Court explicitly acknowledged that it did not apply this standard in adopting the remedy in issue. The court stated that it was "fully cognizant" that the submitted plans "were formulated without exacting considera- tion of whether they returned the Northern New Castle County schools to the precise position they would have as- sumed 'but for' the found constitutional violations." 447 F. Supp. 982, 1009 (Del. 1978). The Court of Appeals on re- view again conceded that the District Court did not make the inquiry identified by *Dayton* but nevertheless found this omission excusable because Wilmington had previously been subject to *de jure* segregation.

This Court has never held that a remedy dismantling local education or devising a scheme of total racial balance is war- ranted simply upon a finding of *de jure* segregation, and in fact, *Swann* held precisely to the contrary. Whatever the nature of the constitutional violation, the standard articulated in *Dayton,* as well as in the predecessors to *Dayton,* requires the District Court to impose changes in local education only to the extent necessary to cure the violation. The Court of Appeals' express departure from the precedents of this Court certainly warrants review.

Our cases indicate that the need for specific findings is par- ticularly compelling when the district court seeks to impose a remedy curtailing local control of education. The District Court here has chosen such a remedy, actually *abolishing* the county's system of education and disenfranchising the voters who formerly retained popular control of education. This has been mandated even though no court has found that these local school boards have engaged in *any* purposeful discrimi- nation since 1954. While on my assumption the absence of purpose does not negate the need for an interdistrict remedy in this case, the conduct of the boards is still relevant to the formulation of that interdistrict remedy. When the "nature of the violation" does not include purposeful discrimination on

the part of the school boards, I am not convinced that a truly "equitable" remedy would abolish those governmental entities that had not been found to purposefully participate in the perpetration of the violations. I had throught that *Milliken* v. *Bradley,* 418 U. S. 717 (1974), would forcefully preclude district courts from imposing such a remedy without the most exhaustive comparison of the nature of the violation and the need for this form of disestablishment of local government.

In *Milliken,* this Court declined to permit the federal courts to impose a remedy of this nature without the most exacting showing of necessity. The Court emphasized that "local control over the educational process affords citizens an opportunity to participate in decisionmaking, permits the structuring of school programs to fit local needs, and encourages 'experimentation, innovation, and a healthy competition for educational excellence.'" *Id.,* at 742. The Court not only emphasized these important benefits of local control, but also recognized the inability of courts and judges to assume that role, noting that "[t]his is a task which few, if any, judges are qualified to perform. . . ." *Id.,* at 744. In *Dayton,* this Court reiterated that "local autonomy of school districts is a vital national tradition." 433 U. S., at 410. It was because of these considerations that *Dayton* insisted that "the case for displacement of the local authorities by a federal court in a school desegregation case must be satisfactorily established by factual proof and justified by a reasoned statement of legal principles." *Ibid.* Yet the District Court has here treated a series of independent school districts much as if they were a "railroad in reorganization," without any attempt to comply with the requirements of *Milliken* and *Dayton. Alexis I. du Pont School Dist.* v. *Evans,* 439 U. S. 1375, 1379 (1978) (REHNQUIST, J., in chambers). If we have any remaining commitment to this "vital national tradition," I think this Court should be certain, before it allows the dismantling of not 1 but 11 independent school boards, that the violations

found warrant this total substitution of judicial for popular control of local education.

Thus I think the principal reason this case merits review is because there is substantial doubt that the abolition of these 11 school districts is an appropriate equitable remedy for the interdistrict violation found by the courts. In addition, I think the failure to apply *Dayton* may also have resulted in a pupil reassignment far more comprehensive and disruptive than that which the established violations warranted. My reading of the District Court opinion indicates that the court devised a remedy creating complete racial balance in every grade of every school throughout the county despite the existence of substantial residential segregation. This is a clear violation of the ruling in *Swann*. For the reasons expressed in my opinion dissenting from the denial of certiorari in *Cleveland Bd. of Ed.* v. *Reed,* 445 U. S. 935 (1980), and by MR. JUSTICE POWELL in his opinion dissenting from the dismissal of certiorari in *Estes* v. *Metropolitan Branch, Dallas NAACP,* 444 U. S. 437 (1980), I do not believe that such an assumption should go unreviewed by this Court. As in those cases, there is substantial record evidence here indicating that the classroom makeup achieved by the order would *not* exist "but for" the supposed constitutional violations. The District Court found that while 43.6% of the city of Wilmington's residents are black, only 4.5% of the county suburban residents are black. Specifically, the court found that since 1950 there had been extensive "white flight" from the city to the suburbs and that "the result of these demographic changes is that the black population of the County is heavily concentrated within the City of Wilmington." 393 F. Supp., at 432–433. The court concluded that "the residential demographic change of the past two decades has had a striking effect on the school attendance patterns in the County." *Id.,* at 433. The court did not find that these residential patterns were attributable solely (or even

principally) to governmental discrimination. Therefore to devise a remedy on the assumption that absent the constitutional violations there would be precise racial parity in the county neighborhoods is impermissible under any traditional notion of an equitable remedy to restore the situation as it would have existed prior to the assumed wrong.

This Court does a disservice to local government and the people of Delaware, and very likely in the long run to the Equal Protection Clause of the Fourteenth Amendment, by once again declining to review a case of such fundamental importance.